IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS **FILED**
EASTERN DIVISION



ROBERT BRYANT,

**MAR 2 5 2005**

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

Plaintiff,

v.

Case No. 04 C 1900

JOHN ASHCROFT,

Hon. Harry D. Leinenweber

Defendant.

## MEMORANDUM OPINION AND ORDER

This is a race discrimination and retaliation case arising from Plaintiff Robert Bryant's employment as an associate warden at the Bureau of Prisons (the "BOP"). Before the Court is Defendant's Motion for Summary judgment.

### I. BACKGROUND

The BOP hired Bryant as a teacher in 1989. In January 1997, after a series of promotions, Bryant became an associate warden and transferred to the Metropolitan Correctional Center (the "MCC") in Chicago. When Bryant arrived at the MCC, the warden was Charles Gilkey. Bryant first alleges that on a single occasion, Gilkey asked him to relieve a correctional officer for thirty minutes so the officer could take a lunch break. Both Gilkey and David Winn, a Caucasian associate warden, had also personally provided lunch relief for correctional officers. (56.1 Stmt. at ¶ 19).

At the MCC, associate wardens receive annual written performance evaluations and midyear reviews. On his first

performance evaluation in April 1997, Bryant received the second highest of five performance ratings. Gilkey praised Bryant as a natural leader and noted that Bryant was developing into an outstanding associate warden. The December 1997 progress report was also positive, but Gilkey stated that Bryant needed to hone his leadership skills and proactively identify problems.

In the April 1998 annual review, Bryant again received the second highest rating and Gilkey noted that Bryant had grown as an associate warden and had tremendous character and integrity. Nonetheless, Gilkey noted that Bryant needed to follow-up, offer constructive criticism, and be more detail-oriented. In the October 1998 progress report, Gilkey praised Bryant's work in certain areas, but criticized Bryant for not providing better oversight, and not taking an active role in decision-making. He also noted that Bryant needed to pay more attention to reports he submitted and study department polies.

In January 1999, Gilkey left the MCC and Jerome Graber became the warden. In his June 1999 review, Bryant's overall rating dropped one level to the third performance level. Graber specifically noted that Bryant needed to show more initiative, pay greater attention to detail, and become more knowledgeable about the programs he supervised. He also noted that Bryant's "constant handshaking of staff and particularly inmates detracts from his position of authority and weakens the respect which is due the

position of [associate warden]." (Def. Exh. J). Gregory L. Hershberger, who was appointed regional manager shortly after Bryant arrived at the MCC, stated that Bryant "must immediately improve his performance in order to meet the demands of a very busy institution." (Id.).

At some point in August 1999, Bryant applied to become a warden. On August 23, 1999, Bryant told Hershberger that he wanted to become a warden. Bryant claims that Hershberger said Bryant would never become a warden. (56.1 SOF at ¶ 44). Hershberger contends, however, that he told Bryant that he would not become a warden unless he improved his work performance. (Id. at ¶ 45). Bryant states that he went to the Equal Employment Opportunity Commission (the "EEOC") office the next day to file a complaint. On October 4, 1999, the Washington, D.C. office of the U.S. Department of Justice (the "DOJ") sent Bryant a letter acknowledging receipt of his complaint against the MCC, which was considered to be filed on September 3, 1999. (Pl. Exh. L).

In the November 1999 review, Graber again criticized Bryant's lack of initiative and program knowledge, and inattention to detail. Graber specifically criticized Bryant's supervision of the Correctional Services Department, and said that Bryant should take a "more active role in reviewing security procedure and communicating identified problem areas to the Warden as well as subordinate staff." (Def. Exh. K). The Corrections Services

- 3 -

Department of the MCC was scheduled for a January 2001 program review. A program review is an audit of a particular department, where the staff review documents and files, interview staff, and write a report identifying deficiencies. To prepare for a program review, the regional director typically orders that a staff assistance visit take place to identify and correct any deficiencies. Hershberger scheduled a staff assistance visit in March 2000. The visit revealed a substantial number of deviations from policy in the Correctional Services Department and Hershberger requested that the department create a corrective action plan. Graber met with Bryant and the captain of the Correctional Services Department, Bryant's subordinate, to analyze and address each deficiency. Graber asked Bryant to prepare the plan and submit it prior to May 1. Bryant submitted the first draft late, which was poorly written, incomplete, and contained many errors in grammar. Graber corrected it and asked Bryant to submit a second draft. Bryant gave Graber a second and then a third draft, which was provided to Hershberger in May 2000.

In his May 2000 review, Bryant's rating was lowered to the second lowest rating. Hershberger noted, "Mr. Bryant's performance continues at a less than satisfactory level. Despite repeated notice of poor performance, no improvement has been noted. Mr. Bryant needs to take seriously the concerns of his supervisors and give immediate attention to correcting his performance

deficiencies." (Def. Exh. O). Graber criticized Bryant's performance for many reasons, including that he did not provide oversight, adequately review policy/procedures to ensure the proper implementation of operations, failed to recognize problems and recommend changes, and failed to adequately communicate with the warden. *See id.* Graber summarized that Bryant's "overall performance . . . has been disappointing. He has not adequately provided the proper oversight necessary to ensure . . . compl[iance] with procedural requirements. . . . [He] must demonstrate a greater proficiency to become knowledgeable . . . of requirements . . . and show greater initiate to recognize and correct deficiencies." *Id.*

In July 2000, a second staff assistance visit to the MCC revealed little improvement from the March visit and additional policy deviations. On August 11, 2000, Graber placed Bryant on a Performance Improvement Plan (a "PIP") and notified him that he had sixty days to raise his performance to an acceptable level or face removal from his position. Graber held weekly meetings with Bryant, and provided Bryant with a document sharing his ideas of how to be an effective associate warden. Bryant admits to the weekly meetings, but contends they were short and unproductive. Hershberger sent Bobby Compton, an associate warden who was experienced in handling correctional service departments, to visit

- 5 -

Bryant and to provide advice and tips. Bryant did not object to Compton shadowing him. (Exh. A. at 37).

On November 21, 2000, Graber notified the region's human resource manager that Bryant had met the technical requirements of the PIP by meeting with him and subordinate employees and developing plans. (Def. Exh. S). However, Bryant's performance was still unsatisfactory because other specific issues of concern had developed, such as Bryant's handling of the workgroup-related reports, failure to adequately oversee a management retreat, and failure to follow Graber's instructions regarding an inmate. *See id.* Graber also prepared a written performance appraisal finding Bryant's performance unacceptable, and Hershberger concurred. (Def. Exh. T).

On November 30, 2000, Hershberger notified Bryant in a memorandum that he would be reassigned to the position of Supervisor of Education at the BOP facility in Milan, Michigan. The transfer to Milan resulted in a higher salary. Bryant retired on April 30, 2004 from the BOP with full retirement benefits. He filed this action in November 2003, which was transferred to the Court in March 2004.

## II.  **LEGAL STANDARD**

### A.  **Summary Judgment**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

## B. Title VII

Title VII prohibits employer discrimination regarding the terms, conditions, or privileges of employment on the basis of race. *See* 42 U.S.C. § 2000e-2(a)(1) (2000). To sustain a claim, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he performed his job well enough to meet his employer's expectations; (3) he was subjected to a materially adverse employment action; and (4) others outside his class were treated more favorably. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742 (1993). The Seventh Circuit has clarified that, to be actionable, adverse employment actions must be materially adverse, such as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest v. Ill. Dep't of*

*Corrections*, 240 F.3d 605, 613 (7th Cir. 2001). After establishing a *prima facie* case, a rebuttable presumption is created that the defendant's decisions were the result of impermissible factors. *See St. Mary's Honor Ctr.*, 509 U.S. at 506. Defendant can rebut this presumption with a legitimate, non-discriminatory reason for its conduct. *Id.* If defendant presents a legitimate non-legitimate reason, plaintiff must show that the proffered reason was pretextual, and that, ultimately, the defendant's actions were based on impermissible discriminatory motives. *See id.* at 507-11.

Title VII also prohibits retaliation. The plaintiff can show indirect retaliation by making a *prima facie* showing that "after filing the charge only he, and not any similarly situated employee who did not file a charge was subjected to an adverse employment action even though he was performing the job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment." *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2000). Thus, the plaintiff must show that the defendant's reasons for taking action are "unworthy of credence" and a pretext for retaliation. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001).

# III. **DISCUSSION**

Bryant, an African American, claims that he was discriminated against on the basis of his race and retaliated against for filing an EEOC complaint in August 1999. The Court notes that Bryant has conceded that one of his initial allegations – Gilkey's use of profanity towards him – is not a valid claim, and two of his other allegations were dismissed before the case was transferred. The Court reviews Bryant's remaining allegations in turn.

## A. **Lunch Relief**

Bryant first alleges Gilkey's order for him to relieve a correctional officer for thirty minutes while the officer took a lunch break was an adverse employment action because it was "viewed by Bryant's subordinates as a belittling experience that undermined his authority." (Pl. Resp. at 10). Defendant responds that the thirty minute assignment was not an adverse employment action in that it did not have a tangible effect on Bryant's job. Further, Gilkey testified that he and associate warden Winn also performed lunch detail to relieve correctional officers.

To establish a *prima facie* case of race discrimination, Bryant must show that there was an adverse employment action that had a tangible effect on his job. *See Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998). Bryant performed lunch duty on one occasion for thirty minutes. Even accepting as true Bryant's coworker's comments that lunch duty was belittling, this is not evidence that

such assignment had a material effect on Bryant's job. Further, there is no evidence that Bryant was treated differently than similarly situated individuals. To the contrary, although Bryant alleges that to his knowledge no other Caucasian associate wardens were required to cover lunch duty, he does not contest Gilkey's testimony that Winn performed the lunch detail on at least two occasions. Additionally, this lunch assignment occurred several years *before* Bryant filed his EEOC complaint and could not be retaliation for filing the complaint. Bryant's first allegation does not establish a *prima facie* case of race discrimination or retaliation.

## B. Conversation with Hershberger

In August 1999, Bryant contends that Hershberger told him that he would never become a warden, which had a tangible job consequence because it was "part and parcel of the overall plan to remove Bryant as Associate Warden and 'put him out to pasture.'" (*Id.* at ¶ 11). Defendant responds that Hershberger told Bryant he would not become a warden unless he improved his performance. Defendant also contends that there was no adverse employment action taken as a result of this conversation. Additionally, there is no retaliation because the conversation preceded Bryant's filing of the EEOC complaint.

Accepting as true Bryant's allegations, the conversation did not have a tangible effect on Bryant's position as an associate

warden and was not an adverse employment action. In fact, there is no evidence that any employment action whatsoever resulted from the conversation. This conversation could not be retaliation for Bryant filing a complaint because it occurred *before* Bryant filed a complaint against the BOP. *See Stone*, 281 F.3d at 644. Therefore, Bryant does not establish a *prima facie* case of race discrimination or retaliation based upon his conversation with Hershberger.

## C. **Staff Assistance Visits**

It is undisputed that Hershberger scheduled the first staff assistance visit in preparation for the January 2001 program review. The staff visit revealed an unusually high number of deviations from policy. It is also undisputed that Graber met with Bryant and asked him to prepare a corrective action plan, that Bryant submitted an incomplete, poorly drafted plan late, and that the plan had to be rewritten several times before it was submitted to Hershberger. Concerned with the number of policy deviations, Hershberger scheduled a second staff assistance visit in June 2000. This visit revealed additional policy deviations and little improvement in earlier policy deviations. Bryant also prepared a corrective action plan from the second visit. (Pl. Exh. A. at 28-30). There was also a third staff assistance visit in November 2000.

Bryant alleges that "ordering the second staff visit constituted an adverse action because it was used by Graber as a basis to place Bryant on a [PIP] that continued to lead to Bryant's dismiss as an Associate Warden at MCC," (Pl. Br. at 12), which was taken in "retaliation for exercising his rights." (Compl. ¶ h). Further, Bryant argues that the policy deviations were the result of severe under staffing, and not his actions.

Defendant responds that Bryant was not performing his job satisfactorily and that none of the staff visits constitute an adverse employment action. Further, Defendant contends that Bryant presented no evidence to counter Hershberger's assertion of his legitimate reason for ordering the follow-up visits – "the institution had not provided him with assurances that the deficiencies found in the first visit had been corrected." (Def. Br. at 13).

Here, it is undisputed that the initial staff visit revealed a substantial number of deviations from policy that needed to be corrected before the January 2001 program review. Even if these policy deviations were in large part a result of under staffing as Bryant contends, it is undisputed that the resulting corrective action plan did not meet Graber's expectations. Further, regardless of Bryant's arguments that he didn't have time to fix the problems before the second review, it is also undisputed that the second visit revealed *additional* policy deviations in Bryant's

department. Bryant's poor performance reviews, combined with the high number of policy errors and draft plan issues, demonstrate that Bryant was not performing his job in a satisfactory manner.

Additionally, even if he were performing in a satisfactory manner, the subsequent staff assistance visits were reasonable in light of the high number of deficiencies and the upcoming January 2001 program review. These visits are not akin to termination, demotion, reduction of responsibility, or material loss of benefit to Bryant, and do not constitute a material adverse employment action. See Oest, 240 F.3d at 613. Further, Bryant has not presented evidence that others outside his class were treated more favorably and were not subject to follow-up staff assistance visits in similar circumstances.

Finally, Bryant has not demonstrated that Hershberger's stated reason for the staff assistance visits was unworthy of credence or was pretextual. See Gordon, 246 F.3d at 888. Bryant merely argues that the timing of the second visit did not provide Bryant with enough time to fix the original problems. Given that the program review was scheduled for January 2001, there was only a small window of time for additional visits to attempt to correct the outstanding policy deviations. This is not evidence of pretext. For all of these reasons, Bryant has not made a prima facie case of retaliation based upon the staff visits.

## D. **Performance Ratings, PIP, and Transfer**

Bryant also alleges that he was subjected to the following retaliatory actions after filing his EEOC complaint: (1) lower performance evaluations because of shaking hands with inmates and unsatisfactory ratings; (2) excessive documentation of trivial matters in reviews; (3) being placed on a PIP; and (4) transfer to Milan. Defendant responds:

> The reasons that Bryant's performance evaluations were lowered over time by three separate supervisors was well documented, and there is no evidence that the gradual decline . . . was a pretext for race discrimination or retaliation. To the contrary, the evidence shows that . . . [it was] because Bryant's performance degenerated to the point that Hershberger found him to be ineffective as an associate warden and transferred him to Milan. Bryant can point to no evidence to show that Hershberger's stated reason . . . is a pretext for discrimination.

(Def. Br. at 14-15).

A review of the record reflects that while Bryant started out with strong ratings in his initial reviews, Gilkey, Graber, and Hershberger all documented problems with Bryant's work performance during the time he was an associate warden at the MCC. In the April and October 1998 reviews, Gilkey noted that Bryant needed better department oversight, to pay more attention to reports submitted, and to study department policies. Gilkey left the MCC in January 1999, and his reviews preceded Bryant's EEOC complaint.

Bryant's ratings deteriorated in the June 1999 review under Graber. Graber highlighted the same concerns that Gilkey had about

Bryant's performance, noting that he needed to show more initiative, greater attention to detail, and become more knowledgeable about the program areas that he supervised. He also criticized Bryant's constant handshaking of inmates in the June 1999 report and in his testimony. (Pl. Exh. I at 25-27). Despite Bryant's contentions that handshaking was permissible and not a violation of policy, his other supervisors were also concerned with his handshaking ritual. For example, Gilkey testified that he viewed the pervasive handshaking as a problem because it made the inmates lose respect for Bryant and he spoke to Bryant about it in 1998 (Pl. Exh. E at 39-41), and Hershberger testified that he was concerned about the handshaking habit because it weakened Bryant's authority and threatened security. (Pl. Exh. J at 29-31). The June 1999 performance evaluation, including the documentation about the handshaking with inmates, occurred two months *before* Bryant filed his EEOC complaint. Thus, it could not have been in retaliation for Bryant's complaint.

Bryant's reviews continued to decline in Fall 1999 when Graber became warden. As discussed more thoroughly in Section I *supra*, the November 1999 review was critical of Bryant's performance. Bryant's performance rating was reduced in May 2000 after the first staff assistance visit and corrective action plan. Both Graber and Hershberger noted substantial problems with Bryant's performance. The second staff visit showed little improvement and additional

deviations, and Graber placed Bryant on a PIP. After several months, Graber and Hershberger continued to find Bryant's performance unacceptable. Hershberger transferred Bryant to become Supervisor of Education at another BOP facility, stating that the transfer was because Bryant was ineffective as an associate warden. This move, while unwelcomed by Bryant, did not result in a loss of benefits or income. In fact, Bryant testified that he made more money in the new job than the old one. The BOP did not terminate Bryant -- he chose to retire with full benefits in April 2004.

Bryant argues that he was performing well and his leadership was exemplary during this time period because there were few unfair labor practice reports filed. (Pl. Br. at 13). However, this is only one aspect of the job and the evidence presented shows that Bryant was failing in his leadership role and performance as an associate warden. In short, Bryant did not perform his job in a satisfactory manner. Further, the Seventh Circuit "already has concluded that negative performance evaluations, standing alone, cannot constitute an adverse employment action (but could constitute, under the right circumstances, evidence of discrimination)." *Sweenie*, 149 F.3d at 556. But even if the reviews, transfer, and PIP collectively constitute an adverse employment action[s], and even if Bryant was performing satisfactorily, Bryant has not made a *prima facie* case of retaliation.

- 16 -

The November 1999, August 2000, and November 2000 performance evaluations, PIP placement, and transfer occurred after Bryant filed his EEOC complaint. However, Bryant has not provided evidence that Graber had personal knowledge of the EEOC complaint prior to his departure from the MCC. Bryant merely asserts that "Graber and other management officials" at the BOP became aware of Bryant's complaint by October 4, 1999, when the DOJ sent Bryant a letter acknowledging the EEOC complaint. (56.1 Resp. ¶ 47). Conversely, Graber testified that he did not know about the EEOC complaint until after Bryant left the MCC in December 2000, and the letter does not list Graber as a recipient or otherwise indicate that he or Hershberger had knowledge of the letter or the complaint. (56.1 SOF ¶ 47; Exh. C at 20-21). Further, even if Graber and Hershberger knew of the EEOC complaint as of October 1999, there is no evidence that their actions were a pretext for retaliation rather than the result of Bryant's ineffectiveness as an associate warden. In short, the evidence presented reflects that Bryant was not doing a satisfactory job as associate warden. Accordingly, Bryant has not made a *prima facie* showing of retaliation or discrimination based upon his performance reviews, PIP, or transfer.

## E. Bobby Compton Visit

During the PIP time period, Hershberger sent Bobby Compton, an associate warden, to visit Bryant for two days and to provide tips

and advice on improving Bryant's performance. Bryant alleges that ordering a "shadow" for Bryant was retaliatory. This allegation can be dismissed quickly. Bryant himself testified that he did not object to Compton shadowing him, and he did not know if associate wardens Compton, Winn, or Lisa Hollingworth ever had anyone shadow them. (Pl. Exh. A., at 37). Bryant has not demonstrated that he was performing satisfactorily, that the "shadowing" was an adverse employment action, or that Hershberger's rationale for Compton's visit – to provide tips and advice – was a pretext for discrimination or retaliation.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: *March 25, 2005*

- 18 -